**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CASE NO.** _____

**UNITED STATES**

**v.**

**SOCIEDAD QUÍMICA Y MINERA**
**DE CHILE ("SQM"),**

**Defendant.**

15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(2)(A),
78m(b)(5), 78ff(a); 18 U.S.C. § 2

_____/

## INFORMATION

The United States charges that, at all times relevant to this Information, unless otherwise
specified:

### The Foreign Corrupt Practices Act

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States
Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among
other things, making it unlawful to act corruptly in furtherance of an offer, promise,
authorization, or payment of money or anything of value, directly or indirectly, to a foreign
official for the purpose of obtaining or retaining business for, or directing business to, any
person.  The FCPA's accounting provisions, among other things, require that any issuer make
and keep books, records, and accounts that accurately and fairly reflect the transactions and
disposition of the company's assets, prohibit the knowing and willful falsification of an issuer's
books, records, or accounts, and prohibit the knowing and willful failure to implement an
adequate system of internal accounting controls.  15 U.S.C. §§ 78m(b)(2), 78m(b)(5), and
78ff(a).

**Relevant Entities and Individuals**

2.        Sociedad Química y Minera de Chile ("SQM") is a chemicals and mining company headquartered in the Republic of Chile ("Chile"). The Company has sales offices in Asia, Europe, North America, and South America. Shares of SQM's stock trade on the New York Stock Exchange as American Depository Receipts, and SQM is required to file periodic reports with the Securities and Exchange Commission ("SEC") pursuant to Section 15(d) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78o(d). SQM is therefore an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78m(b).

3.        "SQM Executive," a Chilean citizen whose identity is known to the United States and SQM, was an officer and high-level executive of SQM from approximately 1990 until he was terminated by the company in or around March 2015. SQM Executive was one of the officers at SQM responsible for implementing SQM's internal accounting controls.

4.        "Chilean Officials 1 through 5" are individuals whose identities are known to the United States and SQM. Each was a Chilean current or former political candidate, office-holder, or political party official and a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

**Overview of the Scheme**

5.        From in or around 2008 to 2015, SQM's corporate budgets included discretionary funding for the office of the Chief Executive Officer ("CEO"). In 2008, the CEO's discretionary fund was approximately US $3.3 million; in 2014 it was approximately US $5.7 million.

6.        Funds budgeted for the CEO's discretionary fund were designated within SQM's accounting system as being intended for payment of, among other things, the CEO's travel,

2

certain of SQM's publicity efforts, and consulting and advisory services deemed necessary by the CEO.

7.      Despite providing for a discretionary fund, SQM knowingly and willfully failed to maintain internal accounting controls that were adequate to ensure that the CEO's discretionary funds were used for their intended purposes, were used in accordance with the law, and were properly recorded in SQM's books and records. In fact, SQM Executive sought and received assistance from SQM employees to disguise some of the payments by directing them to create fictitious invoices and contracts for services that were not rendered, pay invoices for which there was no evidence of services being performed to justify the payments, and falsely record some of the payments in SQM's books and ledgers.

8.      As a result, during the relevant period, SQM Executive used the CEO's discretionary fund to direct payments totaling approximately US $14.75 million in SQM funds to Chilean politicians, political candidates, and individuals connected to them (collectively, "politically exposed persons" or "PEPs"), many of which violated Chilean tax law and/or campaign finance limits, and caused payments of those funds to be falsely recorded in the SQM's books and records.

**Improper Payments from the CEO's Discretionary Fund**

9.      Between in or around 2008 and 2015, at SQM Executive's direction, SQM paid approximately US $14.75 million to PEPs and related parties without effective internal accounting controls, such as appropriate due diligence, documentation, or oversight.

10.     One way in which SQM made payments to PEPs was by routing payments to foundations supported by politicians. For example, between in or around 2008 and 2013, SQM transferred approximately US $160,000 from the CEO's discretionary fund to foundations supported by Chilean Official 1. For example, on or about December 22, 2010, Chilean Official

3

1 wrote to SQM Executive's assistant with a message for SQM Executive seeking money from SQM: "Sorry to insist, but we are desperate, since we only reached 20% of our goal. Do you have any capacitation surplus to transfer us by any chance? I'll wait to hear from you. Thank you so much."1 SQM Executive's assistant forwarded the message to SQM Executive, and in January 2011, Chilean Official 1's foundation received a payment of approximately US $18,000 from the CEO's discretionary fund.

11.     At SQM Executive's direction, SQM also paid approximately US $630,000 from the CEO's discretionary fund during the relevant period to foundations controlled by Chilean Official 2, who at times during the relevant period had influence over the Chilean government's plans for mining in Chile, an issue of central importance to SQM's business. For example, on or about January 14, 2014, Chilean Official 2 wrote to SQM Executive's assistant, requesting that she "move forward with the agreement of the support that SQM will provide . . . according to my discussion with [SQM Executive]. This requires obtaining a certificate of donation with social purposes, so you will have to coordinate with the lawyer." In addition, Chilean Official 2 asked SQM Executive to support his daughter's foundation. In or around January 2014, at SQM Executive's direction, SQM paid approximately US $16,000 to a foundation supported by Chilean Official 2.

12.     Another way in which SQM made payments to PEPs was by paying vendors associated with PEPs pursuant to fictitious contracts and invoices for services that were not rendered, or contracts and invoices for which there was no evidence of services being performed. SQM did not conduct due diligence on or obtain anti-corruption representations from its vendors,

---

1 The emails referenced in this Information were written in Spanish and thus the language from the emails quoted herein are translations.

and it allowed approval of payments to vendors without independent verification that the payments were proper, that the prices charged by the vendors for the purported services were reasonable, or that the services reflected on the vendor invoices had actually been received by SQM.

13.     The vendor invoices paid by SQM to vendors associated with PEPs indicated that SQM had received professional services in return for its payments, when in reality, SQM received nothing from the vast majority of the vendors submitting the invoices, and some of the invoices were simply created to disguise payments to PEPs.

14.     For example, in or around July 2009, at SQM Executive's direction, SQM paid approximately US $11,034 on an invoice for purported "financial services" submitted by the sister-in-law of Chilean Official 3.  However, Chilean Official 3's sister-in-law rendered no services to SQM and submitted the invoice solely in order to facilitate a disguised payment by SQM to a Chilean senatorial campaign.

15.     Similarly, SQM paid numerous invoices submitted by vendors connected to Chilean Official 4, including approximately US $63,000 between in or around December 2008 and in or around September 2012 for purported "communications advice" from Chilean Official 4's former advisor and chief of staff, and approximately US $29,000 in or around July through October 2009 for purported "consulting services" by a relative of Chilean Official 4.  SQM made these payments without receiving any evidence that the "communications advice" or "consulting services" were provided, and to date is unable to identify any evidence that they were provided.

### SQM's Falsification of Its Books and Records

16.     In connection with the improper payments described above, SQM falsely recorded some of these payments in its books and records in order to conceal the payment scheme.

17.     For example, SQM falsely recorded the payments referenced in Paragraph 155 above as "communications advice" and "consulting services" despite knowing that the payments were not, in fact, for such services rendered.

18.     In addition to concealing the nature of the payments from the CEO's discretionary fund, SQM employees, including SQM Executive and other SQM employees, knowingly and willfully disguised the destination of these payments.  For example, in or around February 2011, at the direction of SQM Executive, two SQM employees created a fake service contract for a fictitious vendor for the sole purpose of funneling SQM funds to a foundation controlled by Chilean Official 5.  Between approximately 2008 and approximately 2012, SQM paid from the CEO's discretionary fund 36 invoices submitted under the contract, for a total of approximately US $577,000.

19.     Similarly, in or around May and in or around June of 2013, an advisor to Chilean Official 1 invoiced SQM for approximately US $4,400 for purported engineering and statistical services.  SQM paid the invoice and booked the payment as having been made in return for such services, despite knowing that such services had not been received from the advisor.

20.     From 2008 to 2013, at the end of each fiscal year, SQM's books and records, including those that SQM Executive and others intentionally falsified to justify payments to vendors connected to PEPs, were used for the purpose of preparing SQM's financial statements.  In addition, during each of these years from 2008 to 2013, SQM Executive signed financial certifications as part of SQM's securities filings that he knew to be false.

**SQM's Continued Failure to Implement Adequate Internal Accounting Controls**

21.     SQM personnel responsible for implementing and maintaining SQM's internal accounting controls, including SQM Executive and another high-level executive, became aware of control failures relating to payments from the CEO's discretionary fund to vendors associated with PEPs but nevertheless failed to take adequate steps to prevent further such payments.  For example, during a 2014 internal audit, SQM identified six vendors paid in 2012 and 2013 that had "high risk" connections to PEPs.  Each of the identified payments was made from the CEO's discretionary fund and was authorized by SQM Executive.  The internal audit report recommended SQM terminate any active contracts with the six high risk vendors identified, to require a compliance addendum for any future contracts, and to maintain backup documentation for each contract transaction.

22.     Despite these internal audit findings, which were summarized for the board of directors, no adequate changes were made to SQM's internal accounting controls.  As a result, SQM's payments to PEPs continued after this internal audit report for an additional six months.  For example, while payments to the son of a Chilean politician stopped in or around September 2014 as a result of the audit, they were replaced by payments to the politician's aide beginning in or around October 2014.

## COUNT ONE
### (Violation of the Internal Controls Provisions of the FCPA)

23.     Paragraphs 1 through 22 are realleged and incorporated by reference as though fully set forth herein.

24.     From in or around 2008 and continuing through in or around 2015, in the District of Columbia and elsewhere, the defendant,

### SOCIEDAD QUÍMICA Y MINERA DE CHILE

knowingly and willfully failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that:  (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary (A) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements and (B) to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences, to wit:  the defendant knowingly and willfully failed to implement, among other internal accounting controls, controls that required:  (a) due diligence for the retention of third party consultants; (b) documentation or other proof that services had been rendered by third party consultants before payment could be made to them; (c) review of payments to government officials, candidates for office, and political party officials to determine such payments' legality; or (d) oversight of the payment process to ensure that payments were made pursuant to appropriate controls, including those described above.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a) and Title 18, United States Code, Section 2.

8

## COUNT TWO
### (Violation of the False Books and Records Provisions of the FCPA)

25.     Paragraphs 1 through 22 are realleged and incorporated by reference as though fully set forth herein.

26.     From in or around 2008, and continuing through in or around 2015, in the District of Columbia and elsewhere, the defendant,

### SOCIEDAD QUÍMICA Y MINERA DE CHILE

knowingly and willfully falsified and caused to be falsified its books, records, and accounts and did not, in reasonable detail, accurately and fairly reflect its transactions and dispositions, to wit: the defendant knowingly falsified records relating to payments to PEPs, and entities associated with PEPs, in order to conceal the true purpose of those payments; all in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.

ANDREW WEISSMANN
Chief, Fraud Section

By:      _____

Lorinda Laryea
Jonathan P. Robell
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
Tel:  (202) 616-5136
Email: Lorinda.Laryea@usdoj.gov
        Jonathan.Robell@usdoj.gov