**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CASE NO. _____

**UNITED STATES OF**

**v.**

**SOCIEDAD QUÍMICA Y MINERA**
**DE CHILE, S.A.,**

15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(2)(A),
78m(b)(5), 78ff(a); 18 U.S.C. § 2

**Defendant.**

_____/

## DEFERRED PROSECUTION AGREEMENT

Defendant Sociedad Química y Minera de Chile, S.A. ("SQM") (the "Company"),

pursuant to authority granted by the Company's Board of Directors, and the United States

Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this

deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the

attached two-count criminal Information in the United States District Court for the District of

Columbia charging the Company with (i) one count of violating the books and records provisions

of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections

78m(b)(2)(A), (b)(4), (b)(5), and 78ff(a), and (ii) one count of violating the internal controls

provisions of the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), (b)(4), (b)(5), and

78ff(a).  In so doing, the Company: (a) knowingly waives its right to indictment on these

charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United

States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal

Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia. The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. Should the Fraud Section pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three (3) years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 11-13 below (the "Term"). The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has failed specifically to perform or to fulfill completely each of the Company's obligation under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without

2

prejudice to the Fraud Section's right to proceed as provided in Paragraphs 17 through 20 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4.      The Fraud Section enters into this Agreement based on the facts and circumstances presented by this case, including:

  a.      the Company did not voluntarily self-disclose the conduct that forms the basis for this Agreement;

  b.      the Company received full cooperation credit based on its cooperation with the Fraud Section's investigation, which included: conducting a thorough internal investigation; producing relevant documents from overseas, accompanied by translations of key documents, to the Fraud Section; and providing to the Fraud Section all relevant facts known to it, including information about individuals involved in the misconduct;

  c.      the Company has committed to continue to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement, and has engaged in a number of remedial measures, including:  (1) reconstituting and staffing new compliance and internal audit divisions; (2) implementing new internal accounting/payment process controls; (3) revising the

corporate Code of Ethics and conducting training for all personnel; (4) voluntarily paying over $9 million in taxes, interest, and penalties to Chilean authorities in connection with the improper payments described in the Statement of Facts; (5) disciplining the employees involved in the improper payments and false books and records described in the Statement of Facts—including terminating the employment of a senior officer of the Company—and demoting another employee; and (6) providing in-depth anti-corruption and compliance training and consultations with outside compliance and internal controls experts to an employee who failed to take appropriate steps in response to red flags regarding the misconduct;

   d. Although the Company has taken a number of remedial measures, the Company is still in the process of implementing its enhanced compliance program, which has not had an opportunity to be tested, and thus the Company has agreed to the imposition of an independent compliance monitor for a term of two years to diminish the risk of reoccurrence of the misconduct; the independent compliance monitor will serve a term of two years instead of three because of the significant enhancements the Company has already made to its compliance program, and because the Company's size and risk profile are such that an independent compliance monitor should not need more than two years to test the Company's compliance program;

   e. the Company has agreed to continue to cooperate with the Fraud Section as described in Paragraph 5 below;

   f. the nature and seriousness of the offense, including the involvement of a senior officer at the Company in a six-year scheme to pay millions of dollars to politicians, political candidates, and individuals connected to them in violation of Chilean tax law and/or

campaign finance limits, and the falsification of records and the creation of fictitious invoices and contracts to conceal the scheme;

g.      the Company has no prior criminal history;

h.      accordingly, after considering (a) through (g) above, the Company received an aggregate discount of 25% off of the bottom of the U.S. Sentencing Guidelines fine range in connection with this Agreement.

## Future Cooperation and Disclosure Requirements

5.      The Company shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct related to corrupt payments, false books and records, and failure to implement adequate internal accounting controls, and circumvention of internal controls under investigation by the Fraud Section, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded or the end of the Term. At the request of the Fraud Section, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct related to corrupt payments, false books and records, and failure to implement adequate internal accounting controls, and circumvention of internal controls under investigation by the Fraud Section at any time during the Term. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the

5

following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

  a. The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its subsidiary companies and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Company.

  b. Upon request of the Fraud Section, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

  c. The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

6.    In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegations of conduct that may constitute violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegations to the Fraud Section.

### Payment of Monetary Penalty

7.    The Fraud Section and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

a.    The 2014 USSG are applicable to this matter.

b.    Offense Level.  Based upon USSG § 2B1.1, the total offense level is 29, calculated as follows:

| | |
|---|---|
| (a)(1)  Base Offense Level | 7 |
| (b)(10) Conduct outside the U.S. | +2 |
| (b)(1)  Value of loss more than $7,000,000 | +20 |
| **TOTAL** | 29 |

c.    Base Fine.  Based upon USSG § 8C2.4(a), the base fine is $14,750,000 (the loss amount)

   d.    <u>Culpability Score</u>. Based upon USSG § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---:|
| (a) | Base Culpability Score | 5 |
| (b)(2) | the organization had 1,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +4 |
| (g)(2) | The organization fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 7 |

<u>Calculation of Fine Range:</u>

| | |
|---|---|
| Base Fine | $14,750,000 |
| Multipliers | 1.4 (min) / 2.8 (max) |
| Fine Range | $20,650,000 / $41,300,000 |

The Company agrees to pay a monetary penalty in the amount of $15,487,500 (which includes the 25% discount described above) to the United States Treasury no later than ten (10) business days after the Agreement is fully executed and filed.  The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case.  The $15,487,500 penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $15,487,500 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this

Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $15,487,500 penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amount that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

### Conditional Release from Liability

8.      Subject to Paragraphs 17 through 20, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement. The Fraud Section, however, may use any information related to the conduct described in the Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

9.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates,

9

agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C.

10. In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment C. The Section, in its sole discretion, may consider the monitor's certification decision in assessing the company's compliance program.

### Independent Compliance Monitor

11. Promptly after the Fraud Section's selection pursuant to Paragraph 12 below, the Company agrees to retain a Monitor for the term specified in Paragraph 13. The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Fraud Section, are set forth in Attachment D, which is incorporated by reference into this

10

Agreement.  No later than the date this Agreement is fully executed, the Company will propose to the Fraud Section a pool of three qualified candidates to serve as the Monitor.  The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

       a.     demonstrated expertise with respect to the FCPA and other applicable anti-corruption laws, including experience counseling on FCPA issues;

       b.     experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including FCPA and anti-corruption policies, procedures and internal controls;

       c.     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

       d.     sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

12.     The Fraud Section retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by the Company, though the Company may express its preference(s) among the candidates.  If the Fraud Section determines, in its sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Fraud Section, in its sole discretion, is not satisfied with the candidates proposed, the Fraud Section reserves the right to request that the Company nominate additional candidates.  In the event the Fraud Section rejects all proposed Monitors, the Company shall propose an additional three candidates within twenty business days after receiving notice of the rejection.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section and the Company will use their best efforts to complete the selection process within sixty calendar days of the execution of this Agreement.  If, during the term of the monitorship, the monitor becomes unable to perform his or

her obligations as set out herein and in Attachment D, or if the Fraud Section in its sole discretion determines that the monitor cannot fulfill such obligations to the satisfaction of the Fraud Section, the Fraud Section shall notify the Company of the release of the monitor, and the Company shall within thirty (30) calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Office will choose a replacement.

13.     The Monitor's term shall be two years from the date on which the Monitor is retained by the Company, subject to extension or early termination as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

14.     At the end of the monitorship, provided all requirements set forth in Attachment D are met, the Company will report on its compliance to the Fraud Section for the remainder of this Agreement, regarding remediation and implementation of the enhanced compliance measures set forth by the Monitor as described in Attachment D. The Company shall designate a senior company officer as the person responsible for overseeing the Company's corporate compliance reporting obligations. During this period, the Company shall conduct and prepare at least one follow-up review and report, as described below:

a.     The Company shall undertake a follow-up review incorporating the Fraud Section's and Monitor's views and comments on the prior Monitor reports, to determine whether the policies and procedures of the Company are reasonably designed to detect and prevent

12

violations of the FCPA and other applicable anticorruption laws. Reports shall be transmitted to the Chief of the FCPA Unit, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Washington, DC 20005.

b.      The follow-up review and report shall be completed by no later than thirty days prior to the end of the Term.

### Deferred Prosecution

15.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

16.     The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months of the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.

### Breach of the Agreement

17.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to

13

implement a compliance program as set forth in Paragraphs 9 through 10 of this Agreement and Attachment C; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the District of Columbia or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

14

18.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of the breach, as well as the actions the Company has taken to address and remediate the situation, which the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

19.     In the event that the Fraud Section determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

20.     The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company

15

breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

21.     Thirty days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

22.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term of the Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to declare a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and

void. The Company shall provide notice to the Fraud Section at least thirty days prior to

undertaking any such sale, merger, transfer, or other change in corporate form. If the Fraud

Section notifies the Company prior to such transaction (or series of transactions) that it has

determined that the transaction(s) has the effect of circumventing or frustrating the enforcement

purposes of this Agreement, as determined in the sole discretion of the Fraud Section, the

Company agrees that such transaction(s) will not be consummated. In addition, if at any time

during the term of the Agreement the Fraud Section determines in its sole discretion that the

Company has engaged in a transaction(s) that has the effect of circumventing or frustrating the

enforcement purposes of this Agreement, it may deem it a breach of this Agreement pursuant to

Paragraphs 16 to 20 of this Agreement.

### Public Statements by Company

23.     The Company expressly agrees that it shall not, through present or future

attorneys, officers, directors, employees, agents or any other person authorized to speak for the

Company make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Company set forth above or the facts described in the Statement of Facts.

Any such contradictory statement shall, subject to cure rights of the Company described below,

constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution

as set forth in Paragraphs 17 through 20 of this Agreement. The decision whether any public

statement by any such person contradicting a fact contained in the Statement of Facts will be

imputed to the Company for the purpose of determining whether it has breached this Agreement

shall be at the sole discretion of the Fraud Section. If the Fraud Section determines that a public

statement by any such person contradicts in whole or in part a statement contained in the

Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid

17

a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

      24.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

      25.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

      26.     This Agreement is binding on the Company and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal

agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

27.     Any notice to the Fraud Section under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Chief, FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20530.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to General Counsel, Sociedad Química y Minera de Chile S.A., El Trovador 4285, 6th floor, Las Condes – Santiago- Chile 7550079, with a copy to Keith M. Rosen, Chadbourne & Parke LLP, 1200 New Hampshire Ave N.W., Washington, DC 20036.  Notice shall be effective upon actual receipt by the Fraud Section or the Company.

**Complete Agreement**

28.     This Agreement, including its attachments, sets forth all the terms of the

agreement between the Company and the Fraud Section.  No amendments, modifications or

additions to this Agreement shall be valid unless they are in writing and signed by the Fraud

Section, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR SOCIEDAD QUÍMICA Y MINERA DE CHILE S.A. ("SQM"):**

Date: Dec 28, 2016          By: _____
                                 Gonzalo Aguirre T.
                                 Legal Vice President and General Counsel
                                 SQM

Date: Dec 28, 2016          By: _____
                                 J. Allen Miller
                                 Keith M. Rosen
                                 Chadbourne & Parke LLP
                                 Counsel for SQM

**FOR THE DEPARTMENT OF JUSTICE:**

                                 ANDREW WEISSMANN
                                 Chief, Fraud Section
                                 Criminal Division
                                 United States Department of Justice

Date: 1/13/2017             By: _____
                                 Lorinda Laryea
                                 Jonathan Robell
                                 Trial Attorneys

20

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Sociedad Química y Minera de Chile S.A. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Legal Vice President and General Counsel for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: Dec 28, 2016

SOCIEDAD QUÍMICA Y MINERA DE CHILE S.A.

By: _____
Gonzalo Aguirre T.
Legal Vice President and General Counsel

## CERTIFICATE OF COUNSEL

I am counsel for Sociedad Química y Minera de Chile (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors, the Chief Executive Officer, and the General Counsel of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: _December 28, 2016_

By: _____

J. Allen Miller
Keith M. Rosen
Chadbourne & Parke LLP
Counsel for Sociedad Química y Minera de Chile, S.A.

ATTACHMENT A

## STATEMENT OF FACTS

1.     The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Fraud Section") and Sociedad Química y Minera

de Chile ("SQM").  SQM hereby agrees and stipulates that the following information is true and

accurate.  SQM admits, accepts, and acknowledges that it is responsible for the acts of its

officers, directors, employees, and agents as set forth below.  Should the Fraud Section pursue

the prosecution that is deferred by the Agreement, SQM agrees that it will neither contest the

admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following

facts establish beyond a reasonable doubt the charges set forth in the criminal Information

attached to the Agreement:

### Relevant Entities and Individuals

2.     SQM is a chemicals and mining company headquartered in the Republic of Chile

("Chile").  The Company has sales offices in Asia, Europe, North America, and South America.

Shares of SQM's stock trade on the New York Stock Exchange as American Depository

Receipts, and SQM is required to file periodic reports with the Securities and Exchange

Commission ("SEC") pursuant to Section 15(d) of the Securities Exchange Act of 1934, Title 15,

United States Code, Section 78*o*(d).  SQM is therefore an "issuer" within the meaning of the

Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78m(b).

3.     "SQM Executive," a Chilean citizen whose identity is known to the United States

and SQM, was an officer and high-level executive of SQM from approximately 1990 until he

A-1

was terminated by the company in or around March 2015. SQM Executive was one of the officers at SQM responsible for implementing SQM's internal accounting controls.

4.      "Chilean Officials 1 through 5" are individuals whose identities are known to the United States and SQM. Each was a Chilean current or former political candidate, office-holder, or political party official and a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

### Overview of the Scheme

5.      From in or around 2008 to 2015, SQM's corporate budgets included discretionary funding for the office of the Chief Executive Officer ("CEO"). In 2008, the CEO's discretionary fund was approximately US $3.3 million; in 2014 it was approximately US $5.7 million.

6.      Funds budgeted for the CEO's discretionary fund were designated within SQM's accounting system as being intended for payment of, among other things, the CEO's travel, certain of SQM's publicity efforts, and consulting and advisory services deemed necessary by the CEO.

7.      Despite providing for a discretionary fund, SQM knowingly and willfully failed to maintain internal accounting controls that were adequate to ensure that the CEO's discretionary funds were used for their intended purposes, were used in accordance with the law, and were properly recorded in SQM's books and records. In fact, SQM Executive sought and received assistance from SQM employees to disguise some of the payments by directing them to create fictitious invoices and contracts for services that were not rendered, pay invoices for which there was no evidence of services being performed to justify the payments, and falsely record some of the payments in SQM's books and ledgers.

A-2

8.      As a result, during the relevant period, SQM Executive used the CEO's discretionary fund to direct payments totaling approximately US $14.75 million in SQM funds to Chilean politicians, political candidates, and individuals connected to them (collectively, "politically exposed persons" or "PEPs"), many of which violated Chilean tax law and/or campaign finance limits, and caused payments of those funds to be falsely recorded in the SQM's books and records.

### Improper Payments from the CEO's Discretionary Fund

9.      Between in or around 2008 and 2015, at SQM Executive's direction, SQM paid approximately US $14.75 million to PEPs and related parties without effective internal accounting controls, such as appropriate due diligence, documentation, or oversight.

10.      One way in which SQM made payments to PEPs was by routing payments to foundations supported by politicians.  For example, between in or around 2008 and 2013, SQM transferred approximately US $160,000 from the CEO's discretionary fund to foundations supported by Chilean Official 1.  For example, on or about December 22, 2010, Chilean Official 1 wrote to SQM Executive's assistant with a message for SQM Executive seeking money from SQM: "Sorry to insist, but we are desperate, since we only reached 20% of our goal.  Do you have any capacitation surplus to transfer us by any chance?  I'll wait to hear from you.  Thank you so much."[1]  SQM Executive's assistant forwarded the message to SQM Executive, and in January 2011, Chilean Official 1's foundation received a payment of approximately US $18,000 from the CEO's discretionary fund.

---

[1] The emails referenced in this Statement of Facts were written in Spanish and thus the language from the emails quoted herein are translations.

11.     At SQM Executive's direction, SQM also paid approximately US $630,000 from the CEO's discretionary fund during the relevant period to foundations controlled by Chilean Official 2, who at times during the relevant period had influence over the Chilean government's plans for mining in Chile, an issue of central importance to SQM's business.  For example, on or about January 14, 2014, Chilean Official 2 wrote to SQM Executive's assistant, requesting that she "move forward with the agreement of the support that SQM will provide . . . according to my discussion with [SQM Executive].  This requires obtaining a certificate of donation with social purposes, so you will have to coordinate with the lawyer."  In addition, Chilean Official 2 asked SQM Executive to support his daughter's foundation.  In or around January 2014, at SQM Executive's direction, SQM paid approximately US $16,000 to a foundation supported by Chilean Official 2.

12.     Another way in which SQM made payments to PEPs was by paying vendors associated with PEPs pursuant to fictitious contracts and invoices for services that were not rendered, or contracts and invoices for which there was no evidence of services being performed.  SQM did not conduct due diligence on or obtain anti-corruption representations from its vendors, and it allowed approval of payments to vendors without independent verification that the payments were proper, that the prices charged by the vendors for the purported services were reasonable, or that the services reflected on the vendor invoices had actually been received by SQM.

13.     The vendor invoices paid by SQM to vendors associated with PEPs indicated that SQM had received professional services in return for its payments, when in reality, SQM

received nothing from the vast majority of the vendors submitting the invoices, and some of the invoices were simply created to disguise payments to PEPs.

14.     For example, in or around July 2009, at SQM Executive's direction, SQM paid approximately US $11,034 on an invoice for purported "financial services" submitted by the sister-in-law of Chilean Official 3.  However, Chilean Official 3's sister-in-law rendered no services to SQM and submitted the invoice solely in order to facilitate a disguised payment by SQM to a Chilean senatorial campaign.

15.     Similarly, SQM paid numerous invoices submitted by vendors connected to Chilean Official 4, including approximately US $63,000 between in or around December 2008 and in or around September 2012 for purported "communications advice" from Chilean Official 4's former advisor and chief of staff, and approximately US $29,000 in or around July through October 2009 for purported "consulting services" by a relative of Chilean Official 4.  SQM made these payments without receiving any evidence that the "communications advice" or "consulting services" were provided, and to date is unable to identify any evidence that they were provided.

### SQM's Falsification of Its Books and Records

16.     In connection with the improper payments described above, SQM falsely recorded some of these payments in its books and records in order to conceal the payment scheme.

17.     For example, SQM falsely recorded the payments referenced in Paragraph 155 above as "communications advice" and "consulting services" despite knowing that the payments were not, in fact, for such services rendered.

18.     In addition to concealing the nature of the payments from the CEO's discretionary fund, SQM employees, including SQM Executive and other SQM employees, knowingly and willfully disguised the destination of these payments.  For example, in or around February 2011, at the direction of SQM Executive, two SQM employees created a fake service contract for a fictitious vendor for the sole purpose of funneling SQM funds to a foundation controlled by Chilean Official 5.  Between approximately 2008 and approximately 2012, SQM paid from the CEO's discretionary fund 36 invoices submitted under the contract, for a total of approximately US $577,000.

19.     Similarly, in or around May and in or around June of 2013, an advisor to Chilean Official 1 invoiced SQM for approximately US $4,400 for purported engineering and statistical services.  SQM paid the invoice and booked the payment as having been made in return for such services, despite knowing that such services had not been received from the advisor.

20.     From 2008 to 2013, at the end of each fiscal year, SQM's books and records, including those that SQM Executive and others intentionally falsified to justify payments to vendors connected to PEPs, were used for the purpose of preparing SQM's financial statements.  In addition, during each of these years from 2008 to 2013, SQM Executive signed financial certifications as part of SQM's securities filings that he knew to be false.

### SQM's Continued Failure to Implement Adequate Internal Accounting Controls

21.     SQM personnel responsible for implementing and maintaining SQM's internal accounting controls, including SQM Executive and another high-level executive, became aware of control failures relating to payments from the CEO's discretionary fund to vendors associated with PEPs but nevertheless failed to take adequate steps to prevent further such payments.  For

A-6

example, during a 2014 internal audit, SQM identified six vendors paid in 2012 and 2013 that had "high risk" connections to PEPs. Each of the identified payments was made from the CEO's discretionary fund and was authorized by SQM Executive. The internal audit report recommended SQM terminate any active contracts with the six high risk vendors identified, to require a compliance addendum for any future contracts, and to maintain backup documentation for each contract transaction.

22.     Despite these internal audit findings, which were summarized for the board of directors, no adequate changes were made to SQM's internal accounting controls. As a result, SQM's payments to PEPs continued after this internal audit report for an additional six months. For example, while payments to the son of a Chilean politician stopped in or around September 2014 as a result of the audit, they were replaced by payments to the politician's aide beginning in or around October 2014.

ATTACHMENT B

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Sociedad Química y Minera de Chile (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to certain improper payments to entities associated with Chilean politicians, political candidates, and individuals connected to them, false accounting of those payments in the Company's books and records, and failure to implement adequate internal accounting controls over those payments; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section; and

WHEREAS, the Company's Legal Vice President and General Counsel, Gonzalo Aguirre T., together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section;

Therefore, the Board of Directors has RESOLVED that:

1.    The Company (a) acknowledges the filing of the two-count Information charging the Company with (i) one count of violating the books and records provisions of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), (b)(4), (b)(5), and 78ff(a), and (ii) one count of violating the internal controls provision of the FCPA, in violation of Title 15, United States Code, Sections 78m(b)(2)(B), (b)(4), (b)(5), and 78ff(a); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c)

B-1

agrees to accept a monetary penalty against Company totaling $15,487,500, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Legal Vice President and General Counsel of the Company, Gonzalo Aguirre T., is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Legal Vice President and General Counsel, Gonzalo Aguirre T., may approve;

4.      The Legal Vice President and General Counsel of the Company, Gonzalo Aguirre T., is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents

as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5. All of the actions of the Legal Vice President and General Counsel of the Company, Gonzalo Aguirre T., which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: December 28, 2016   By: _____

Corporate Secretary
Sociedad Química y Minera de Chile S.A.

B-3

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Sociedad Química y Minera de Chile ("SQM" or the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains:  (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.

*Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws"), which policy shall be memorialized in a written compliance code.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

     a.     gifts;

     b.     hospitality, entertainment, and expenses;

     c.     customer travel;

     d.     political contributions;

     e.     charitable donations and sponsorships;

      f.     facilitation payments; and

      g.     solicitation and extortion.

4.     The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

      a.     transactions are executed in accordance with management's general or specific authorization;

      b.     transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

      c.     access to assets is permitted only in accordance with management's general or specific authorization; and

      d.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses

and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### Proper Oversight and Independence

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Training and Guidance

8.      The Company will implement mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include:  (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b)

C-4

corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.    The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include: (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

### Mergers and Acquisitions

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

ATTACHMENT D

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and

the obligations of Sociedad Química y Minera de Chile S.A. ("SQM" or the "Company"), on

behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United

States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), are as

described below:

1.      The Company will retain the Monitor for a period of not less than two years (the

"Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the

Deferred Prosecution Agreement (the "Agreement") is triggered.  Subject to certain conditions

specified below that would, in the sole discretion of the Fraud Section, allow for an extension of

the Term of the Monitorship, the Monitor shall be retained until the criteria in Paragraphs 19-20

below are satisfied or the Agreement expires, whichever occurs first.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's

compliance with the terms of the Agreement, including the Corporate Compliance Program in

Attachment C, so as to specifically address and reduce the risk of any recurrence of the

Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the

manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and

financial reporting policies and procedures of the Company as they relate to the Company's

current and ongoing compliance with the FCPA and other applicable anti-corruption laws

(collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view,

D-1

may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Department, pursuant to the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the

Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.     The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by:  (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least one follow-up review and report as described in Paragraphs 16-18 below.  With respect to the initial report, after consultation with the Company and the Fraud Section, the Monitor shall prepare the first written work plan within sixty calendar days of being retained, and the Company and the Fraud Section shall provide comments within thirty calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the Company and the Fraud Section, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the Fraud Section shall provide comments within twenty calendar days after receipt of the written work plan.  Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents.  The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.  In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than one hundred twenty calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written report within one hundred fifty calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws.  The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section.

13.    Within one hundred fifty calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty

calendar days of receiving the report, the Company notifies in writing the Monitor and the Fraud Section of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred fifty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five calendar days after the Company serves the written notice.

14.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section. The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.    With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

*Follow-Up Reviews*

16.    A follow-up review shall commence no later than one hundred and eighty calendar days after the issuance of the initial report (unless otherwise agreed by the Company,

the Monitor and the Fraud Section).  The Monitor shall issue a written follow-up report within one hundred twenty calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section.

17.     Within one hundred twenty calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section.  The Fraud Section may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its

obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section.

### Certification of Compliance and Termination of the Monitorship

19.     At the conclusion of the ninety calendar day period following the issuance of the follow-up report, if the Monitor believes that the Company's compliance program is reasonably designed and implemented to detect and prevent violations of the anti-corruption laws and is functioning effectively, the Monitor shall certify the Company's compliance with its compliance obligations under the Agreement.  The Monitor shall then submit to the Fraud Section a written report ("Certification Report") within sixty calendar days.  The Certification Report shall set forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.  The Certification Report should also recommend the scope of the Company's future self-reporting.  Also at the conclusion of the ninety calendar day period following the issuance of the follow-up report, the Company shall certify in writing to the Fraud Section, with a copy to the Monitor, that the Company has adopted and implemented all of the Monitor's recommendations in the initial and follow-up report(s), or the agreed-upon alternatives.  The Monitor or the Company may extend the time period for issuance of the Certification Report or the Company's certification, respectively, with prior written approval of the Fraud Section.

20.     At such time as the Fraud Section approves the Certification Report and the Company's certification, the monitorship shall be terminated, and the Company will be permitted to self-report to the Fraud Section on its enhanced compliance obligations for the remainder of the term of the Agreement. The Fraud Section, however, reserves the right to terminate the monitorship absent certification by the Monitor, upon a showing by the Company that termination is, nevertheless, in the interests of justice.

21.     If permitted to self-report to the Fraud Section, the Company shall thereafter submit to the Fraud Section a written report no later than 30 days prior to the end of the Term setting forth a complete description of its remediation efforts to date, its proposals to improve the Company's internal accounting controls, policies, and procedures for ensuring compliance with the anti-corruption laws, and the proposed scope of the subsequent reviews. The report shall be transmitted to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005. The Company may extend the time period for issuance of the self-report with prior written approval of the Fraud Section.

### Extension of the Term of the Monitorship

22.     If, however, at the conclusion of the ninety calendar-day period following the issuance of the Monitor's follow-up report, the Fraud Section concludes that the Company has not by that time successfully satisfied its compliance obligations under the Agreement, the Term of the Monitorship shall be extended for one year.

23.     Under such circumstances, the Monitor shall commence the second follow-up review no later than sixty calendar days after the Fraud Section concludes that the Company has

not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written follow-up report within one hundred twenty calendar days of commencing the second follow-up review in the same fashion as set forth in Paragraph 12 with respect to the initial review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.  A determination to terminate the monitorship shall then be made in accordance with Paragraphs 19-20.

24.     If, after completing the second follow-up review, the Fraud Section again concludes that the Company has not successfully satisfied its obligations under the Agreement with respect to the Monitor's Mandate, the Term of the Agreement and the Monitorship shall be extended pursuant to Paragraph 3 of the Agreement, and the Monitor shall commence a third follow-up review within sixty calendar days after the Fraud Section concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Fraud Section).  The Monitor shall issue a written follow-up report within one hundred twenty calendar days of commencing the third follow-up review in the same fashion as set forth in Paragraph 12 with respect to the initial review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.

*Monitor's Discovery of Potential or Actual Misconduct*

25.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the

Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- the Company may have maintained false books, records or accounts;

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Directors' Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section at any time, and shall report Potential Misconduct to the Fraud Section when it requests the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and not to the Company, namely, where the Potential Misconduct:  (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Directors' Committee of the Company should occur as the Fraud Section and the Monitor deem appropriate under the circumstances.

(d)    The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and address the Company's failure to disclose the necessary information in his or her reports.

(e)    The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

### Meetings During Pendency of Monitorship

26.    The Monitor shall meet with the Fraud Section within thirty calendar days after providing each report to the Fraud Section to discuss the report, to be followed by a meeting between the Fraud Section, the Monitor, and the Company.

27.    At least annually, and more frequently if appropriate, representatives from the Company and the Fraud Section will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section, including with respect to the scope or costs of the monitorship.

### Contemplated Confidentiality of Monitor's Reports

28.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of

the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.